Surisa Rivers (SBN 250868)
Surisa Rivers Law Office
2910 W. Broadway, Suite 100B
Los Angeles, CA 90041
Phone: (323)312-5320
Fax: (323)617-3190
*riverslawoffice@gmail.com*
Attorney for Plaintiff, Gordon Toth

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GORDON TOTH, an individual,<br><br>          Plaintiff,<br><br>     v.<br><br>BARSTOW UNIFIED SCHOOL DISTRICT,<br><br>          Defendant. | **CASE NO. 5:12-cv-02217 TJH (DTBx)**<br><br>**HON. TERRY J. HATTER, JR.**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56**<br><br>Hearing Date: April 7, 2014<br>Hearing Time: Under Submission<br>Judge: Hon. Terry J. Hatter, Jr.<br>Courtroom: 17 |

1
2
## Table of Contents
3
I.      INTRODUCTION.................................................................................2

II.     RELEVANT FACTS .........................................................................4

        A.      Employment History and Disabilities  ................................ 4

        B.      Typing Reports Is Not An Essential Function ...................... 5

        C.      Defendant's Undue Delay of the Interactive Process  ........... 8

        D.      Defendant's Bad Faith Interactive Process and Failure to
                Accommodate  ...................................................................... 10

III.    STANDARD OF REVIEW ..............................................................16

IV.     ARGUMENT ...................................................................................17

        A.      Plaintiff Was Able To Perform the Essential Functions..................... 17

                1.      "Word Processing" Is A Qualification Standard...................20
                2.      Evidence Shows Typing Reports Is Not An
                        Essential Functions...................................................20

        B.      Defendant Failed to Engage In a Timely, Good Faith Interactive
                Process................................................................................22

                1.      BUSD's Undue Delay of the Interactive Process Violated Section
                        12940(n)...............................................................22
                2.      BUSD Unlawfully Cut Off Interactive Process With Plaintiff Without
                        Providing Effective Accommodation..............................24

V.      DEFENDANT HAS NO UNDUE HARDSHIP DEFENSE AS A
        MATTER OF LAW.................................................................26

VI.     CONCLUSION................................................................................26
25
26
ii
27
28

1

**Table Of Authorities**

2

**State Cases**

3  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)................................. 16

4  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)........................................ 20

5  *Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224 .......... 26

6  *Hanson v. Lucky Stores, Inc.,* 74 Cal.App.4th 215 (Cal. App. Ct. 1999)................ 28

7  *Prillman v. United Airlines, Inc.* (1997) 53 Cal.App.4th 935 ........................ 26

8

9

**Federal Cases**

10

*Barnett v. U.S. Air*, 228 F.3d 1105 (9th Cir. 2000) ........................ 26, 27, 29

11  *Bates v. United Parcel Service, Inc.*, 511 F.3d 974 (9th Cir. 2007)....... 21, 22, 23, 24

12  *Beck v. University of Wis. Bd. of Regents*, 75 F.3d 1130 (7th Cir. 1996) ............... 26

13  *Dark v. Curry Cnty.*, 451 F.3d 1078 (9th Cir. 2006)...................... 21, 22, 27

14  *Humphrey v. Memorial Hospitals Association*, 239 F.3d 1128, 1137 .............. 26, 28

15  *Hutton v. Elf Atochem North America, Inc.*, 273 F.3d 884 (9th Cir. 2001) ............. 21

16  *Kaplan v. City of North Las Vegas*, 323 F.3d 1226 (9th Cir. 2003)................... 21, 27

17  *KRL v. Moore*, 384 F. 3d 1105, 1110 (9th Cir. 2004) ............................... 20

18  *McAlindin v. County of San Diego*, 192 F.3d 1226, 1237 (9th Cir. 2000)............... 28

19  *Morton v. United Parcel Service, Inc.*, 272 F.3d 1249, 1255 (9th Cir. 2001).......... 21

20  *Rohr v. Salt River Project Agricultural Improvement and Power*
    District, 555 F.3d 850, 863 (9th Cir. 2009)................................... 21

21  *Taylor v. List*, 880 F. 2d 1040, 1045 (9th Cir. 1989)……………………………...20

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT

1

**Statutes**

2

42 U.S.C. §12111 ..................................................................... 3, 17, 25

3

Cal. Educ. Code § 56327 ................................................................. 8, 21

4

Cal. Gov't Code § 12900 ...................................................................... 3

5

Cal. Gov't Code § 12940.............................................................. *passim*

6

Section 504 of the Rehabilitation Act of 1973................................. 3,4, 17, 20

7

**Rules**

8

9

29 CFR § 1630.2............................................................................ *passim*

10

Fed. R. Civ. P. 56 ............................................................................. 16

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT

## I.   INTRODUCTION

For over 20 years, Gordon Toth was a model school psychologist for the Barstow Unified School District, known for his strong evaluations and genuine care for students and families. His experience evaluating, counseling and creating educational plans for children with disabilities spans over 39 years. Despite several serious medical conditions, Plaintiff has received a plethora of commendations throughout his career from supervisors, co-workers and school administrators. Plaintiff loved his work and greatly valued the career he built over nearly four decades. Throughout his career as a school psychologist, Plaintiff was never required to type his psycho-educational evaluation reports[1] ("reports") to perform his job – until June 2010. In less than a year, Plaintiff's career ended after being denied an effective accommodation to prepare his reports.

In July 2009, Plaintiff's supervisor, Janet Newton retired and was replaced by Joni James as the Director of Pupil Services. In April 2010, Plaintiff learned that BUSD would be laying off Andrea Williams, a part-time clerical employee whose main job duty was to type the evaluation reports for all school psychologists. Plaintiff promptly informed Susan Levine, who was the Superintendent at the time, and Joni James that he needed typing assistance because of his medical conditions, severe Carpal Tunnel Syndrome (CTS), osteoarthritis and neuropathy from diabetes. BUSD management delayed initiating the interactive process for four months and failed to distinguish the essential from the non-essential functions of Plaintiff's position. Instead, the Assistant Superintendent of Personnel Services, Jeffrey Malan (the current Superintendent) solely relied on JPA's Nancy Stater, to create BUSD's

---

[1] With the expansion of the Individuals with Disabilities Education Act, implementing regulations and parallel California Education Code, the evaluation reports prepared by school psychologists have become lengthy and average about 18 pages. [#9 ]

2
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1   Essential Function Job Analysis/Job Description ("EFJA"). The EFJA was "pulled

2   from" another school district without any input from Plaintiff's supervisor or other

3   BUSD employee. BUSD management finally met with Plaintiff in August 18, 2010

4   and informed him he would be provided Dragon NaturallySpeaking to prepare his

5   reports. Plaintiff was provided the appropriate software in November 2010. On

6   December 1, 2010, Ric Marchi, the Dragon software expert hired to train Plaintiff,

7   told Malan and Stater via email that there were numerous obstacles Plaintiff had to

8   overcome to become self-sufficient with Dragon to prepare his reports. He also

9   informed them that the additional training still might not be enough for Plaintiff.

10  Malan decided to terminate the interactive process after Plaintiff's last training on

11  December 16, 2010, knowing that the provided accommodation was not working for

12  Plaintiff and despite Marchi's warnings. Unable to use Dragon for his reports, as

13  Malan and Stater were informed would be a possibility, Plaintiff received continuous

14  criticism and disciplinary memos by his supervisor. Plaintiff's physical and mental

15  health deteriorated under the mounting pressure as his backlog of reports increased

16  until he was forced to take a medical leave in March 2011. Plaintiff filed the pending

17  action on December 12, 2012, which include the following claims: Violation of 42

18  USC § 12111, *et seq.* (ADA); Section 504 of the Rehabilitation Act of 1973;

19  Constructive Discharge under Cal. Gov't Code § 12900 *et. seq.*; Failure to

20  Accommodate, Cal. Gov't Code § 12940(m); Failure To Engage In Timely, Good

21  Faith Interactive Process, Cal. Gov't Code § 12940(n), Harassment, Cal. Gov't Code

22  § 12940(h), and Failure to Take All Reasonable Steps to Prevent Harassment, Cal.

23  Gov't Code § 12940(k).

24       The present motion seeks partial summary judgment relating to Plaintiff's

25  ADA, Section 504, Section 12940(m), and Section 12940(n) claims, and BUSD's

26  Undue Burden defense. Plaintiff's motion does not address damages, but only

27  liability. In sum, BUSD violated the ADA, Section 504 and Cal. Gov't Code

3

28

§12940(m), and Cal. Gov't Code § 12940(n) as a matter of law by: (1) requiring Plaintiff to perform a non-essential function despite his disabilities; (2) failing to provide an effective accommodation; (3) unilaterally ending the interactive process, knowing the accommodation was not working; and (4) unduly delaying the interactive process for over four months. Finally, BUSD has not and cannot produce any evidence supporting an undue burden defense. Because there is no genuine issue of material fact as to Plaintiff's ADA, Section 504, Cal. Gov't Code §§ 12940(m), 12940(n) claims, Plaintiff is entitled to judgment as a matter of law on these claims. BUSD has no undue burden defense because it has failed to produce any evidence in support of said defense.

## II.    RELEVANT FACTS

### A.    Employment History and Disabilities

Defendant, Barstow Unified School District ("BUSD" or "Defendant"), hired Plaintiff in 1989 after an extensive search for a qualified school psychologist. [#1] Plaintiff relocated his family from Canada for the position. [#2] Plaintiff has an extensive academic and work background in school psychology. He has published numerous articles in his field and has served as facilitator at professional and academic conferences throughout the years. [#3-4] Plaintiff has received numerous letters of reference and commendations from previous supervisors, co-workers and school administrators. [#5] At the time of his hiring, the BUSD agreed to provide Plaintiff typing services to prepare the psycho-educational evaluation reports ("reports"). [#8] Several clerical staff provided this assistance throughout his 20+ years of employment. [#9] The part-time office assistant, Andrea Williams, who last typed his reports and reports for the other psychologists, was let go in a reduction in force in June 2010. [#10]

In or about 1993-1994, Plaintiff was diagnosed with CTS, in both hands but severely in his left hand, which he likely inherited because his mother had the same

4

1    condition. [#11] Plaintiff received physical therapy for his CTS for a year at
2    Chaparral therapy from Jeffrey Malan's brother. [#12] Plaintiff also has osteoarthritis
3    and neuropathy, related to his diabetes, which caused numbness and tingling in his
4    hands and feet. [#13] Although Plaintiff's disabilities caused him some pain and
5    discomfort as he performed his responsibilities as a school psychologist, he was able
6    to work without any issues until 2010. [#14]

7    **B.    Typing Reports Is Not An Essential Function**

8    According to Nancy Stater, "essential functions" of a position under the ADA
9    and FEHA are defined as "the activities that are required to fulfill all of the job duties
10   and the job description that has been prepared on that position of employment." She
11   further testified that essential functions are "pulled from the job description" and
12   "someone come[s] out and meet[s] with a supervisor, meet[s] with an HR, to build
13   the Essential Function Job Analysis of various positions of employment . . . they pull
14   the information from the supervisors because the supervisors are the parties that know
15   how to do that job that identifies what it takes to make this job work for that
16   department." Stater, emphasized, "The supervisor needs to be there because the
17   supervisor knows how to do that job." [#15-17] Stater understood that the ADA and
18   FEHA prohibited an employer from requiring an employee to perform a non-essential
19   job function, which the employee cannot perform because of a disability. [#18]

20   In July 2010, when Stater was requested to assist BUSD with Plaintiff's
21   interactive process, she "rarely" prepared job descriptions for purposes of the
22   interactive process or essential function job analysis because it was not a part of her
23   job responsibilities. The District's Essential Functions Job Analysis / Description
24   (EFJA), which was used for Plaintiff's interactive process was seriously flawed
25   because it was not developed or created with any input or based on any discussions
26   with Plaintiff's supervisor, Assistant Superintendent of Personnel Services (the
27   District's HR person) or anyone else from BUSD. Rather, Nancy Stater simply

28

5

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT

1  duplicated an EFJA that was specifically created for a Bellflower Unified School
2  District school psychologist to use for Plaintiff. [#19-21]

3      Stater did not use any job descriptions for Plaintiff's position to create the
4  EFJA and did not request the job descriptions from BUSD to create an EFJA for
5  Plaintiff. Stater testified that it was not necessary to use existing job descriptions of
6  Plaintiff's position for *his* Essential Function Job Analysis because another EFJA was
7  pulled from Bellflower School District and it was "approved" by his supervisor and
8  HR after they discussed and reviewed the essential functions. [#22-23] Stater
9  believed the EFJA was "valid" because HR and Joni James had reviewed it and
10 approved it. The Bellflower EFJA (used for Toth's EFJA) included a list of
11 "Qualification Standards" that including "word processing" among dozens of other
12 standards. The EFJA prepared by Stater for Toth, cut and paste the list of
13 qualification standards but omitted the title "Qualification Standards." [#24]

14     Stater did not receive any input from anyone from BUSD regarding the EFJA
15 *before* she emailed it to BUSD for its review. Stater did not have any follow up
16 conversations with Joni James or Jeff Malan to review the EFJA. [#25] Stater
17 reviewed the physical requirements of the EFJA before sending over to BUSD and
18 believed they were accurate. An actual analysis of the descriptions show it was too
19 stringent for Plaintiff's position. [#26] Stater believed that most school psychologists
20 do mostly cutting and pasting for their reports. This was inaccurate with regards to
21 how BUSD prepared its reports, which Stater failed to determine. [#27]

22     As the facilitator, Stater did not make any determinations that "typing" was an
23 essential function of Plaintiff's position. [#28] Stater believed that either Malan or
24 James determined typing was an essential function prior to the interactive meeting
25 with Plaintiff. [#29] Stater was not a part of the conversation determining that typing
26 was an essential function of Plaintiff's position. Stater also believed that during an
27 interactive meeting it was determined "that typing was part of the essential functions

6

28

1  of that position of employment because the secretary, no one has a secretary, no one

2  in particular had a secretary that was designated to them to do their typing." [#30]

3  During the interactive process, Nancy Stater did not know that Plaintiff had never

4  been required to type reports before. [#31]

5      Jeffrey Malan was not involved in any discussions regarding the essential

6  functions of Plaintiff's position. Malan did not make any decisions relating to the

7  essential functions of Plaintiff's position. Specifically, Malan did not recall whether

8  "typing" was an essential function as a topic of discussion. [#32] According to

9  Malan, Stater's function "was to formulate job function analysis descriptions." Malan

10  does not believe he had any discussions with Stater regarding the EFJA because he

11  was "not Mr. Toth's direct supervisor" who had intimate knowledge of his position

12  and because he does not recall "going over these types of things for Mr. Toth's job

13  duties." [#33] Malan believes that Stater had the 1990 version of the job description

14  when she created the EFJA for Plaintiff because "she usually requests if we have

15  current job descriptions, what they would entail, before she would do something like

16  this." Malan referred to what was written in the EFJA when asked if BUSD or Stater

17  determined that typing was an essential job function of a school psychologist. [#34-

18  35]

19      Joni James did not "contribute in anyway with the development" of the EFJA.

20  James does not know what an essential function job analysis is and does not know

21  who completed an essential function job analysis for Plaintiff." James did not provide

22  a job description to anybody relating to creating the EFJA for Plaintiff's interactive

23  meeting. James is unable to remember if she was a decision maker regarding what

24  accommodation BUSD would provide Plaintiff. [#36-39]

25      All of the District's job descriptions (dated between 1989-90) of a school

26  psychologist omit clerical skills or typing as a requirement to perform the position.

27  The 1990 job description is the most recent description of BUSD's school

28

1   psychologist position. Personnel Services had not updated the description over the

2   last several years because the job responsibilities did not change much. Similarly, a

3   2005 detailed description of Plaintiff's position submitted along with his I-140

4   Immigrant Petition for Alien Worker omits any mention of typing or clerical skills.

5   [#40-42].

6          According to Janet Newton, Plaintiff's supervisor between 2003 and 2009,

7   typing was not an essential function of a BUSD school psychologist. [#43] During the

8   interviews conducted by Newton, whether a candidate had clerical skills or could

9   type was not an area of concern or focus. Rather, school psychologists were hired

10  based on their experience and/or knowledge in evaluating students with disabilities,

11  identifying their needs, and making appropriate recommendations towards supporting

12  those students. [#44]. During the time Plaintiff was supervised by Newton, there was

13  a clerical staff specifically hired to type the psycho-educational evaluation reports for

14  all of the school psychologists, not just Plaintiff. [#45]. Andrea Williams' position

15  was being considered for elimination when Janet Newton was supervising Plaintiff.

16  Ms. Newton would have reassigned the task of typing Plaintiff's reports to other

17  clerical staff working within pupil services as an accommodation for Plaintiff. At that

18  time, Ms. Newton had two clerical employees supporting her department and shared

19  another clerical employee with the Director of Pupil Services. [#46].  Between April

20  2010 and March 2011, James had three clerical staff assigned to support her in Pupil

21  Services. [#47]. The District never considered whether typing could be reassigned to

22  clerical staff as an accommodation. [#48] There is no requirement under the

23  Education Code for the psycho-educational assessment reports to be typed. Rather,

24  the code only requires "a written report" for any assessment conducted. *See* Cal.

25  Educ. Code § 56327. [#49] Plaintiff *was* able to handwrite his reports and would

26  provide handwritten reports for clerical staff to type the reports. Plaintiff continued

27  handwriting his reports when he was unable to use the voice recognition software the

8

1  District provided him. Jeffrey Malan confirmed that Plaintiff was handwriting his

2  reports up until the time he left BUSD. [#50].

3  **C.    Defendant's Undue Delay of the Interactive Process**

4          Nancy Stater testified that based on her 30+ years of experience relating to

5  providing employees reasonable accommodations in California, an employer is

6  required to meet an employee "as quickly as possible" when an employee requests a

7  disability related accommodation. [#51] Malan similarly testified that an employer is

8  required to begin the interactive process when the "employee makes you aware

9  and/or you become knowledgeable of a disability." [#52] The first step of the

10  interactive process, Nancy Stater, is to undergo an essential function analysis for the

11  employee's position. [#53]

12          When an employee asks for a disability-related accommodation, BUSD

13  initiates the interactive process by contacting Southern California School Risk

14  Management Joint Power Authority ("JPA"). [#54] Malan relied on the expertise of

15  Nancy Stater, from JPA, during Plaintiff's interactive process. [#55] Nancy Stater

16  was the facilitator during the interactive process for Plaintiff. [#56] Malan did not

17  reference any policies, reference materials or any other individuals for assistance

18  during Plaintiff's interactive process. [#57] Malan was not aware of the District's

19  Reasonable Accommodation policy that is available online, however, not produced

20  by BUSD in response to Plaintiff's request for all policies relating to providing

21  employees reasonable accommodations. [#58] James never received any training

22  during her time with BUSD regarding the interactive process or reasonable

23  accommodations for employee with disabilities. [#59]

24          BUSD waited for over four months to initiate the interactive process for

25  Plaintiff. [#60-69]. Plaintiff made his initial request for an accommodation on April

26  7, 2010. In his request, Plaintiff explained that BUSD agreed to provide typing

27  assistance for his reports, which was now needed because of his medical conditions.

9

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT

1   [#60]. Rather than initiating the interactive process, BUSD's superintendent wrote

2   Plaintiff a memo, stating that the District had no records showing that Plaintiff had a

3   disability or of a prior agreement to provide typing assistance. [#61] On May 6, 2010,

4   BUSD Personnel Department received a letter from Robert D. Myers, Former

5   Assistant Superintendent Personnel Services for BUSD, confirming the District

6   agreed at the time Plaintiff was hired to provide "secretarial services in order to type

7   his reports." [#62] On April 27, 2010, BUSD Personnel Department received a letter

8   from Plaintiff's physician, Dr. Ahluwalia, describing Plaintiff's medical conditions

9   and that Plaintiff should not be "typing his psychological reports . . . ranging from 12

10  to 25 pages" as it could "accelerate his carpal tunnel syndrome." [#63]

11          Malan sent an email to Joni James on May 13, 2010, stating, "Had a brief

12  discussion with Gordon Toth regarding his "accommodation" regarding his Carpal

13  Tunnel Syndrome." James replies, "Maybe you and I can get together and discuss

14  what exactly the Doctor states his disability is. . . . How restrictive is his note and

15  does he maybe need to see a Doctor of the District's choice? Just my thoughts. Let's

16  get together." Malan then responds, "Before we decide anything we are getting

17  direction from JPA . . . ." [#64-66]

18          BUSD did not contact Nancy Stater to begin the interactive process until July

19  of 2010. [#67] BUSD set up the first interactive meeting for Plaintiff on August 18,

20  2010, over four months after his written request. Malan did not know why the first

21  meeting did not occur until August 18, 2010. [#68] Plaintiff was available to meet

22  and worked his regular schedule from April 2010 through August 2010, however,

23  was not contacted until late July 2010 to set up a meeting. [#69]

24          When Williams left in June 2010, Plaintiff took up to 25 hours to prepare one

25  report. He would soak his hands in ice water to reduce the swelling and terrible pain

26  caused by the hours of typing. Plaintiff spent hours trying to use Dragon to prepare

27  his reports, however, his computer constantly froze. [#70] Rob Bolton, who was the

10

28  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION
    FOR PARTIAL SUMMARY JUDGMENT

Director of Purchasing at the time, was responsible for buying the software and training Plaintiff. However, Bolton told Plaintiff that he had no experience with Dragon software. Bolton spent a few minutes trying to train Plaintiff and later expressed that he did not have time for it. [#71] Plaintiff's son came to his office to try to help with Dragon, however, he was still unable to resolve the problem. [#72]

**D.    Defendant's Bad Faith Interactive Process and Failure to Accommodate**

For five months, between June 2010 and October 2010, BUSD did not provide Plaintiff any typing assistance for his reports. James "never thought about" Plaintiff's ability to prepare his reports without assistance. [#73] Instead, during the interactive process and *before* Plaintiff was provided the correct version of Dragon, Plaintiff received reprimands from his supervisor for his failure to prepare typed reports. [#74] BUSD openly admits that Plaintiff was subject to discipline for his reports when BUSD was supposed to be engaging in a good faith interactive process. Malan openly admitted he treated the matter as "a progressive disciplinary matter throughout the whole process." [#75]. On September 28, 2010, was told:

> <u>Effective immediately</u> you are to complete your reports in the proper manner.. To assist you with the task of completing your reports Dragon Speak Naturally has been purchased and installed on your computer[2]. You have been provided assistance with learning the program and have been give [sic] a book[3] to assist you. [] If this method is not working for you <u>I suggest you find a solution</u> that will.

[#76]. During the same meeting, Plaintiff informed James that the program was not working. James wrote in her notes, "I told him that he needed to find a solution."

---

[2] Plaintiff learned in October 2010 during a meeting with Ric Marchi that the wrong version was installed on his computer. [#84]

[3] Plaintiff tried reading the book to learn the software, however, was found the material unhelpful. Later, Plaintiff learned that the book did not match the version of software that was installed on his computer. [#76]

11

1   [#78-79]. Stater testified that she would have advised BUSD <u>to not</u> discipline

2   Plaintiff regarding his reports during the interactive process because it was important

3   that he receive sufficient time and training on the software. [#80]

4          On October 6, 2010, James met with Plaintiff regarding her frustrations with

5   Plaintiff's lack of communication. During the meeting Plaintiff informed James that

6   she was building a case to get rid of him. She agreed to look into the legal

7   requirements of a written assessment under the Education Code. James wrote in her

8   memorandum that Plaintiff "would strive to find a solution" so he can accomplish his

9   job. [#81-83]. James never followed up with Plaintiff regarding the requirements of a

10  written report, but continued insisting Plaintiff had to type the reports. [#82]

11         On October 12, 2010, Ric Marchi, the Dragon expert hired to train Plaintiff by

12  Nancy Stater, discovered that the version of Dragon installed on Plaintiff's PC by the

13  District "was wholly inadequate to accomplish the tasks required of him." [#84] Also,

14  on October 12, 2010, Plaintiff submitted a written complaint to the personnel

15  department regarding James' harassment and abusive supervision practices. [#85].

16         On October 20, 2010, Joni James filled out a Supervisor's Incident

17  Investigation Report, stating that during a school psychologist meeting, Plaintiff

18  "stood up, stated he was stressed and walked out." [#86] On October 21, 2010, James

19  sent Plaintiff a memo "RE: Reports" stating,

20              While the District is working to provide you with accommodations, it is
21              important that your caseload not be completely out of compliance.
                Therefore, it has been agreed that the District will pay overtime to
22              Rhonda Powell until the time Dragon Speak Naturally Medical
                is installed on your computer and you have received training on the
23              program. <u>Following training you will be responsible for your own
                reports and the overtime for Rhonda will cease.</u>
24

25  [#87]. Plaintiff also was instructed to only discuss his reports with Powell "when she

26  is on the time card for overtime only." Stater had no input or knowledge of the

27                                            12

1   restrictions placed on Powell's assistance. [#88] According to Stater it was important

2   for Plaintiff to receive the needed training and time to learn the correct version of

3   Dragon for preparing his reports. [#89] In addition, Stater testified that at the

4   November 8, 2010 interactive meeting, BUSD agreed to provide Plaintiff typing

5   assistance as a temporary accommodation until he received sufficient training on

6   Dragon and was able to use the software to prepare his reports. Stater further testified

7   that there was no cut-off time in providing the temporary accommodation for

8   Plaintiff. [#90] This accommodation was cut-off, however, prior to Plaintiff being

9   provided time to learn the program to prepare his reports. [#91]

10      Malan instructed Joni James to end Powell's assistance in typing Plaintiff's

11   reports when he learned about the arrangement. As a result, Plaintiff lost his

12   temporary accommodation before being able to sufficiently use Dragon for his

13   reports. [#91] Plaintiff again fell far behind in his reports. By December 16, 2010, the

14   day of his last training on Dragon, Plaintiff had a large stack of reports on his desk

15   that needed to be typed. [#94] Malan originally testified that he did not know about

16   the arrangement, was upset when he learned of it, and never considered it an

17   accommodation [#92] Malan later changed his testimony, stating that he did know

18   about the arrangement and had approved it. [#93]

19      Again, on October 21, 2010, Plaintiff filed a written complaint to the Personnel

20   Department regarding harassment by James and requesting the harassment stop.

21   Plaintiff was never informed that BUSD conducted an investigation as required by its

22   nondiscrimination policy. [#95] James was never questioned regarding any complaint

23   filed by Plaintiff against her. [#96] Malan was the nondiscrimination compliance

24   officer for BUSD in 2010 and responsible for receiving and investigating complaints.

25   [#97] Malan was not sure if BUSD conducted an investigation. [#98]

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT

1    Plaintiff finally received the appropriate version of Dragon software in

2 November 2010. Ric Marchi trained Plaintiff for nine hours over three sessions -

3 November 2, 4 and 9, 2010. After the training, Plaintiff continued to struggle with

4 using Dragon to prepare his reports as his computer would freeze or the program

5 would make errors or not recognize terms he used. At the November 8, 2010

6 interactive meeting, BUSD agreed to pay for an additional training session and to

7 meet again in December after the training. [#99]

8    On December 1, 2010, Ric Marchi, the Dragon software expert hired to train

9 Plaintiff, informed Malan and Stater by email of numerous obstacles Plaintiff had to

10 overcome to become self-sufficient with Dragon to prepare his reports. Marchi

11 warned that additional training still might not be enough for Plaintiff and that

12 Plaintiff's disabilities may be preventing him from using the software. [#100-101]

13 Malan did not discuss these concerns with Marchi and did not consider whether

14 Plaintiff's disabilities were interfering with ability to use the software. [#102] Stater

15 did not have any discussions with Malan or anyone from BUSD regarding whether

16 Plaintiff's disabilities were interfering with his ability to use the software. [#103] As

17 Marchi warned, Plaintiff was not able to prepare reports within a reasonable time

18 using Dragon after his final training in December 2010 despite his best efforts. [#104]

19    Malan decided to terminate the interactive process with Plaintiff, knowing that

20 Dragon software was not working because he believed Plaintiff was refusing to use

21 Dragon. [#105] Malan had contacted BUSD's employment attorneys for advice to

22 implement progressive discipline against Plaintiff in or about January 2011. [#108]

23 Malan began drafting a "Notice of Unprofessional Conduct and Unsatisfactory

24 Performance" to Toth with assistance of counsel in or about March 2011. In support

25 of the District's disciplinary notice, Malan relies on Plaintiff's problematic reports

26 and the September 28, 2010 written reprimand from James to Plaintiff during the

27

28
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1    interactive process. [#110] Malan never spoke to Plaintiff about his training or ability

2    to use the software. Malan received no reports from Marchi, James or Stater that

3    Plaintiff was refusing to use the software. [#107] Malan formed his belief that

4    Plaintiff was *refusing* to use the software (and not unable to use) the Dragon software

5    because he believed Plaintiff was given ample training and sufficient time "to be able

6    to use the software in preparing his reports in a timely manner." [#111-112]  "Q. *Did*

7    *Ms. Stater inform you that Mr. Marchi believed that Mr. Toth had ample and*

8    *sufficient training*? The Witness [Malan]: *I'm going to say yes. Otherwise, we would*

9    *not have proceeded the way we did*." [#113]. However, Nancy Stater testified that she

10   never reported to Malan or anyone else with the District that Plaintiff received

11   "sufficient" or "ample" training. She also provided unequivocal testimony that she

12   had no communication with anyone from the District after the November 8, 2010

13   interactive meeting. [#114] Stater did not discuss Plaintiff's training with Marchi

14   after December 2010. [#115]

15          On March 2, 2011, James sent Plaintiff a Conference Summary Memo

16   reprimanding Plaintiff for his behavior at a meeting for a student and failures in

17   completing his triennial assessments on time. The memo states, "During the

18   conference I inform you that you are expected to meet the timelines of your position

19   and be in compliance with all your reports and testing." [#116] On March 8, 2011,

20   James sent a memo to Malan informing him that Plaintiff was late in preparing 23

21   assessment reports of his 48 cases. James attached a spreadsheet of Plaintiff's cases

22   and identified which cases were out of compliance. [#120-121] Neither James nor

23   Malan continued the interactive process with Plaintiff when they learned that the

24   accommodation was not working for Plaintiff. [#122]

25          Neither James nor Malan contacted Ric Marchi to see how the training went or

26   to ask whether Plaintiff should be able to use the program for his reports. [#123]

27

28
                                            15
     MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION
                        FOR PARTIAL SUMMARY JUDGMENT

1   Nancy Stater had no contact of any kind with the District regarding Plaintiff after the

2   November 8, 2010 interactive meeting. [#124] No one followed up with Plaintiff to

3   see how the accommodation was working. [#125] Plaintiff's physical and mental

4   health deteriorated because he was unable to prepare type written reports with the

5   Dragon software. [#126]  Plaintiff was required to take a medical leave of absence on

6   March 11, 2011. [#127]

7          Plaintiff suggested various accommodations that would work for him, which

8   were summarily rejected, including, looking into a transcription service (which is

9   common in the medical field); another school psychologist, Tori Busco (a salaried

10  employee), had offered to type his reports; receiving sufficient training on Dragon

11  and appropriate time to learn the software; ending the ongoing harassment by Joni

12  James by giving him a different supervisor; and reassigning the task to the other

13  clerical staff within pupil services. [#48, 128] There is ample evidence that a

14  reassignment could have provided. At the time, Joni James supervised three clerical

15  employees within Pupil Services. [#47, 128]

16  **III.    STANDARD OF REVIEW**

17         Summary judgment is appropriate when "the pleadings, depositions, answers to

18  interrogatories, and admissions on file, together with the affidavits, if any, show that

19  there is no genuine issue as to any material fact and that the moving party is entitled

20  to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the

21  initial burden of demonstrating the absence of a "genuine issue of material fact for

22  trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When a motion for

23  summary judgment is properly made and supported, the burden then shifts to the

24  nonmoving party whose response must set out specific facts showing a genuine issue

25  for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). See also, Fed. R. Civ. P.

26  56(e)(2).

27

28

16

To defeat the motion for summary judgment, the responding party must present admissible evidence sufficient to establish any of the elements that are essential to the moving party's case and for which that party will bear the burden of proof at trial. *Taylor v. List*, 880 F. 2d 1040, 1045 (9th Cir. 1989). The Court may grant summary judgment if the motion and supporting materials, including the facts considered undisputed, show the movant is entitled to summary judgment and if the responding party fails to properly address the moving party's assertion of fact as required by Rule 56(c). *See* Fed. R. Civ. P. 56(e). The responding party cannot point to mere allegations or denials contained in the pleadings. It is not enough for the non-moving party to produce a mere "scintilla" of evidence. *Celotex Corp.*, at 252. Instead, the responding party must set forth, by affidavit or other admissible evidence, specific facts demonstrating the existence of an actual issue for trial. *KRL v. Moore*, 384 F. 3d 1105, 1110 (9th Cir. 2004).

## IV.   ARGUMENT

### A.   Plaintiff Was Able To Perform the Essential Functions.

The parties have stipulated to the fact that Plaintiff has a disability within the meaning of the ADA and FEHA. [#6] The parties have also stipulated that Defendant is an "employer" as defined under the ADA and FEHA and a "program or activity" as defined by Section 504 of the Rehabilitation Act. [#7] The remaining issues relating to Plaintiff's ADA and Section 504 claims are (1) whether Plaintiff is a qualified individual as defined by the ADA, 42 U.S.C. §12111(8), and its implementing regulations, 29 CFR § 1630.2; and, if applicable, (2) whether BUSD failed to provide Plaintiff a reasonable accommodation in violation of Title I of the ADA.

Plaintiff is required to establish that he is a "qualified" to prevail on his claim of discrimination under the ADA. *Hutton v. Elf Atochem North America, Inc.*, 273 F.3d 884, 892 (9th Cir. 2001); 42 U.S.C. § 12112(a). Whether a plaintiff is qualified

17

1    for a position "is a two-step inquiry. The court first examines whether the individual

2    satisfies the 'requisite skill, experience, education and other job-related requirements'

3    of the position. The court then considers whether the individual "can perform the

4    essential functions of such position" with or without a reasonable accommodation.

5    *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 990 (9th Cir. 2007) (*en banc*)

6    (citing 29 C.F.R. § 1630.2(m); 42 U.S.C. § 12111(8)). Here, there is no question as to

7    whether Plaintiff meets requisite skills for the position of a school psychologist.

8    Indeed, Plaintiff was a school psychologist within BUSD for 23 years. *See e.g. Rohr*

9    *v. Salt River Project Agricultural Improvement and Power* District, 555 F.3d 850,

10   863 (9th Cir. 2009). The issue of whether Plaintiff is "qualified" turns on whether he

11   could perform the "essential functions" of his position with or without an

12   accommodation. A court consider whether an employee "can perform the job's

13   essential functions without reasonable accommodation, and then, if he cannot,

14   whether he can do so with reasonable accommodation."  *Dark v. Curry Cnty.*, 451

15   F.3d 1078, 1086 (9th Cir. 2006); *Kaplan v. City of North Las Vegas*, 323 F.3d 1226,

16   1231 (9th Cir. 2003).

17         The implementing regulations to Title I of the ADA define essential functions

18   as the "fundamental" duties of a job, not the "marginal functions of the position." 29

19   C.F.R. §1630.2(n)(1); *Bates*, 511 F.3d at 988; *see also Morton v. United Parcel*

20   *Service, Inc.*, 272 F.3d 1249, 1255 (9th Cir. 2001). In *Bates*, the Ninth Circuit

21   distinguished "qualification standards" from "essential functions" under the ADA, as

22   follows:

23         **Essential functions' are not to be confused with "qualification standards**,"
          which an employer may establish for a certain position. Whereas "essential
24        functions" are basic "duties," 29 C.F.R. § 1630.2(n)(1), "qualification
          standards" are "personal and professional attributes" that may include
25        "physical, medical [and] safety" requirements. (29 C.F.R. § 1630.2(q)). **The**
26        **difference is crucial**.

27

28                                                    18

. . .

> **The statute does not require that a person meet each of an employer's established "qualification standards,"** however, to show that he is "qualified."

*Bates*, 511 F.3d at 990 (emphasis added).

The ADA regulations list the following reasons a function may be considered essential: "because the reason the position exists is to perform that function," "because of the limited number of employees available among whom the performance of that job function can be distributed," and/or the "function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." 29 CFR § 1630.2(n)(2)(i)-(iii). If an employer disputes a plaintiff's claim that he can perform the essential functions of his position, then the employer must "put forth evidence establishing those functions." *Bates*, 511 F.3d at 991. The implementing regulations list out at least seven factors, discussed below, that would provide evidence of whether a particular function is essential includes. *See* 29 CFR 1630.2(n)(3)(i)-(vii). If an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job. *Dark v. Curry Cnty.*, 451 F.3d at 1087. However, "an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description." *Cripe v. City of San Jose*, 261 F.3d 877, 887 (9th Cir. 2001). Thus, job descriptions that are created *after* an accommodation request and which include the task (central to the accommodation request) as an essential function of the position for the first time should be viewed with great skepticism.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

**1.     "Word Processing" Is A Qualification Standard**

The District never determined that preparing typed reports was an essential function of its school psychologist position. The plain language of the Essential Function Job Analysis "pulled" by Nancy Stater (and used for Plaintiff's interactive meetings) *does not* state that "typing reports" are an essential function of a school psychologist. Instead, the EFJA states that the school psychologist needs to "[m]aintain student records, including special education reports, confidential records, records of services provided, and behavioral data. <u>Clerical duties</u>." Where the EFJA lists the "Knowledge/Abilities" of the position, it includes "word processing." The EFJA's description of "word processing" as knowledge or ability implies those skills are "qualification standards." Moreover, the list of skills that include word processing is pulled directly from the "Qualification Standards" of the Bellflower EFJA used by Stater. [#24]. Therefore, as a matter of law, those skills **are not an** "essential function" of the position. *See* 29 C.F.R. §1630.2(n)(1); *Bates*, 511 F.3d at 990.

**2.     Evidence Shows Typing Reports Is Not An Essential Functions**

Deposition testimony of Superintendent Malan, Joni James and Nancy Stater confirm that the District never determined that typing reports was an essential function prior to engaging in the interactive process. [#24-39]. Rather, BUSD management decided to make "typing reports" a new requirement of Plaintiff's position because the District decided to eliminate a part-time clerical position. [#30]. Rather than distribute the clerical employee's job responsibilities among the remaining three (3) clerical employees working in Pupil Services (or even consider doing so) [#48], the District unlawfully transformed a marginal skill into an essential function in its effort to force Plaintiff to type his own reports. In doing so, BUSD violated the ADA, Section 504 and FEHA as a matter of law.

None of the reasons listed in 29 CFR § 1630.2(n)(2)(i)-(iii) that describe when a function may be considered essential applies to this case.  The "reason" a school

20

psychologist position exists is *not* to type; there are many more employees within BUSD who can type than who can perform the job responsibilities of a school psychologist; and neither Plaintiff nor any other incumbent in the position of school psychologist was "hired for his or her expertise or ability" to perform typing. [#8, 44-45] Indeed, Plaintiff informed BUSD that he would not type his own reports as a condition of employment, to which BUSD agreed. [#8]

As Plaintiff has presented evidence showing he was able to perform the essential functions of his position, BUSD must "put forth evidence establishing those functions." *Bates*, 511 F.3d at 991. In determining the essential functions an initial inquiry looks into the reason the position exists. A school psychologist exists to evaluate students with disabilities, determine eligibility for special education, develop IEPs, counsel students, and work with staff in implementing supports and services for students with disabilities. [#35, 44]. The purpose of the position is *not* to perform clerical work. Next, an application of the applicable factors determining essential functions is necessary. Namely, (i)     The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs. Plaintiff discusses each factor in turn.

First, neither Malan nor James testified that the District decided that typing was an essential function of Plaintiff's position. James testified that she did not know what an essential function was and that she did not participate in anyway with development of the essential functions analysis. She also stated that she did not provide any job descriptions to determine the essential functions. [#36-39] Malan

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1   testified that he was not involved in determining the essential functions and did not

2   recall any discussions on whether typing was an essential function. As he was not a

3   part of the determination, he could only refer to "what was written" in the EFJA when

4   asked whether BUSD determined typing was an essential job function of a school

5   psychologist. [#35] According to Plaintiff's former supervisor, Janet Newton, who

6   had intimate knowledge of the BUSD school psychologist position, typing was never

7   considered a essential function. [# 43-45]

8          Second, none of the existing job descriptions for Plaintiff's position includes

9   "typing" or clerical skills as a requisite skill and/or function of the position. [#40-42]

10  Third, it is undisputed that for more than 20 years Plaintiff spent no time typing

11  reports. Fourth, there were no legal consequences to not requiring Plaintiff to type his

12  reports per Cal. Educ. Code § 56327. Plaintiff *was* able to provide legible handwritten

13  reports as required by the Education Code. [#49-50] Other employees within BUSD

14  could have typed plaintiff's reports because typing is not a highly specialized skill.

15  [#9, 45-47, 50] The fifth factor is not relevant because Plaintiff's position is non-

16  union. As to the sixth and seventh factors, BUSD did not require any of its prior or

17  current school psychologists to type their reports because it employed a clerical

18  employee with that specific job duty. [#9, 45] Accordingly, Plaintiff was able to

19  perform the essential functions of his position without an accommodation.

20  **B.     Defendant Failed to Engage In a Timely, Good Faith Interactive Process.**

21         **1. BUSD's Undue Delay of the Interactive Process Violated § 12940(n).**

22         California courts generally follow federal ADA cases when interpreting FEHA,

23  except where they may undermine provisions of California law that provide more

24  protections to employees than the ADA. *Gelfo v. Lockheed Martin Corp.*, 140

25  Cal.App.4th 34, 57 (Cal.App. Ct. 2006). Unlike the ADA, under FEHA employees

26  have a separate cause of action when an employer fails to engage in the interactive

27

28
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1  process required by Cal. Gov't Code section 12940(n). *Claudio v. Regents of*

2  *University of California* (2005) 134 Cal.App.4th 224, 243. Thus, failure to engage in

3  the interactive process is a separate FEHA violation and distinguishable from the

4  employer's failure to accommodate, which is also a FEHA violation under §

5  12940(m). *Claudio*, *supra*, at p. 242.

6        Under both the ADA and FEHA, once an employer is aware that the employee

7  has a disabling condition that may need accommodation, an employer as an

8  affirmative and "mandatory obligation" to begin the interactive process to determine

9  whether it can provide a reasonable accommodation. *Humphrey v. Memorial*

10  *Hospitals Association*, 239 F.3d 1128, 1137 (citing to *Barnett v. U.S. Air*, 228 F.3d

11  1105, 1114 (9th Cir. 2000)); *Prillman v. United Airlines, Inc.* (1997) 53 Cal.App.4th

12  935, 950-951 (emphasis added). An employer *is* liable "for remedies imposed" by the

13  ADA if the employer fails "to engage in the interactive process in good faith . . . if a

14  reasonable accommodation would have been possible." *Humphrey*, 239 F.3d at 1137-

15  1138 (citing *Barnett*, 228 F.3d at 1116). With regards to the effect of delaying the

16  interactive process, the Ninth Circuit has held:

> The interactive process requires communication and good-faith exploration of
> possible accommodations between employers and individual employees, and
> neither side can delay or obstruct the process. *Id*. at 1114-15; *Beck v.*
> *University of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) ("A party
> that obstructs or delays the interactive process is not acting in good faith. A
> party that fails to communicate, by way of initiation or response, may also be
> acting in bad faith.").

*Humphrey*, 239 F.3d at 1137-1138.

      The first step the employer is required to take during the interactive process is

"identify barriers to equal opportunity" which involves "identifying and

distinguishing between essential and nonessential job tasks." *Barnett*, 228 F.3d at

1114 (citing to S. Rep. No. 101-116, at 35 (1989); 29 C.F.R. Pt. 1630, App. S

23

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT

1630.9). It is important for the employer to determine the essential functions prior to the first interactive meeting so the employer and employee can determine whether an employee can perform the essential functions, first without an accommodation. *See Dark v. Curry Cnty.*, 451 F.3d at 1086; *see also Kaplan v. City of North Las Vegas*, 323 F.3d at 1231. If the employer and employee determine the employee cannot perform the essential functions without an accommodation, the next inquiry is whether the essential functions can be performed with a reasonable accommodation. Determining the essential functions of a position, therefore, is crucial in conducting a good faith interactive process. *See id.*

BUSD was aware of its obligations under section 12940(n), which prohibits an employer from delaying or interfering with the interactive process. [#51-53] Without any reason or explanation, BUSD decided to wait almost four months before contacting Stater to begin the interactive process with Plaintiff. [#54-69] Malan who was responsible for ensuring BUSD complied with its nondiscrimination policies testified that he did not know why Plaintiff's first interactive meeting was not scheduled until August 18, 2010. [#68]. Emails from Malan in May 2010, however, show that he was aware of the requested accommodation and his intention to contact the District's JPA prior to making any decisions. [#64-66] However, the JPA was not contacted until late July 2010. [#67] Any attempt by BUSD to establish that it initiated the interactive process prior to the end of July 2010 is futile. As a matter of law, BUSD violated § 12940(n) and the ADA's requirement to engage in the interactive process in its undue delay of the interactive process.

**2.     BUSD Unlawfully Cut Off Interactive Process With Plaintiff Without Providing Effective Accommodation.**

Even if preparing typed reports was an essential function, Defendant unlawfully terminated the process before identifying an effective accommodation.

24

The duty to accommodate is a "continuing duty" and "not exhausted by one effort. *Humphrey*, 239 F.3d at 1138 (citing *McAlindin v. County of San Diego*, 192 F.3d 1226, 1237 (9th Cir. 2000)). Where the employer is aware that the initial accommodation is failing the employer has a duty to re-engage in the interactive process *Id*. at 1138. In it discretion to choose an employee's accommodation, the employer must choose an accommodation that is "effective" and reasonable. *See Hanson v. Lucky Stores, Inc.,* 74 Cal.App.4th 215, 228 (Cal. App. Ct. 1999) (citing to the Appendix to the ADA regulations). BUSD was well aware that the provided accommodation was not working for Plaintiff. [#100-122] Despite his requests for another accommodation, BUSD refused to engage in the interactive process. [#104-108] Malan testified he believed Plaintiff had sufficient training and time to use Dragon to prepare his reports and therefore cut off the interactive process. [#105]. Even if Malan was informed by Stater or Marchi (which he was not) that Plaintiff had received sufficient training and time, Malan still had a responsibility under the ADA and FEHA to engage in the interactive process to provide Plaintiff an opportunity to respond to the District's belief that Plaintiff was refusing to use Dragon. However, Malan and BUSD management did not have the conversation with Plaintiff. [#107,125] Instead, Malan contacted BUSD's legal counsel to prepare disciplinary action against Plaintiff [#108, 110], planned for Plaintiff's replacement[4] [#109], while James was allowed to continue reprimanding and harassing Plaintiff for his inability to keep up with his reports. [# 106]

Plaintiff has produced significant evidence that Dragon was not an effective accommodation. Rather than make any attempt to show Dragon was an effective

---

[4] Plaintiff's replacement, Renee Garcia, began on the same day he left work early and went on medical leave.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

1   accommodation for Plaintiff, BUSD only argues that Plaintiff refused to use the

2   program without any supporting facts or evidence.

3   **V.    DEFENDANT HAS NO UNDUE HARDSHIP DEFENSE AS A MATTER**

4   **OF LAW**

5         Defendant has the burden to establish an undue hardship defense. *Barnett*, 228

6   F.3d at 1113. A Defendant must show that providing the requested accommodation

7   would require significant difficulty or expense. Several factors determine whether an

8   employer has a undue hardship defense, including the nature and cost of the

9   accommodation, the overall financial resources of the Defendant, the number of

10   persons employed, the effect on expenses and resources; and the overall impact of the

11   proposed accommodation on the operation of the Defendant's ability to conduct

12   business. 42 U.S.C. §§ 12113(a), 12111(10). BUSD has not produced any evidence

13   establishing an undue hardship defense. BUSD's Final Pretrial Conference Order

14   provides the law required to establish an undue hardship defense, however, fails to

15   reference a single fact or piece of evidence to support any undue hardship defense.

16   *See* FPC Order, Doc. 21, 27:24-28:17. Stater testified that she did not know whether

17   BUSD determined providing typing assistance would create an undue hardship.

18   [#129]. Malan testified that the District would not go broke but he was looking for an

19   accommodation that would be cost saving. [#130]. Based on the undisputed evidence,

20   BUSD is unable to establish an undue hardship defense as a matter of law.

21   **VI.    CONCLUSION**

22         For the foregoing reasons, Plaintiff respectfully requests the Court to grant his

23   motion for partial summary judgment.

24   Dated:  March 11, 2014                              Surisa Rivers Law Office

25

26                          By: _____

26                               Surisa Rivers, Attorney for Plaintiff

27

28